**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

| | |
|---|---|
| DUSTIN DYER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 3:19-cv-921-JAG |
| | ) |
| SHIRRELLIA SMITH, *et al*., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| _____ | ) |

**BRIEF OF AMICI CURIAE PROFESSORS KATHERINE MIMS CROCKER**
**AND BRANDON HASBROUCK IN SUPPORT OF NEITHER PARTY**
**WITH RESPECT TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

INTEREST OF AMICI ........................................................................................ 1

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 2

I.       There are good reasons to recognize a *Bivens* action against TSA agents who
         violate airline passengers' Fourth and First Amendment rights. ....................... 2

         A.      Fourth and First Amendment *Bivens* actions against TSA agents
                 are consistent with prior cases from the Fourth Circuit and the
                 Eastern District ..................................................................................... 3

         B.      Fourth and First Amendment *Bivens* actions against TSA agents are
                 consistent with the Bill of Rights' core concerns and history. ................. 5

         C.      Both claims present new *Bivens* contexts, but Defendants fail to invoke
                 any special factors requiring the Court to decline to recognize damages
                 remedies. ............................................................................................... 8

                 1.      Defendants cite no alternative remedial structure. ...................... 8

                 2.      The context of this case does not raise national-security
                         concerns different from contexts in which *Bivens* claims are
                         already allowed. ..................................................................... 11

                 3.      None of the other concerns Defendants cite qualify as
                         special factors. ....................................................................... 15

II.      There are good reasons to reject Defendants' assertion of qualified immunity. ............. 16

         A.      Defendants have waived this defense for the Fourth Amendment claim. ........... 16

         B.      The First Amendment right appears to be clearly established. ............................ 16

CONCLUSION .................................................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Ill. v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012) ........................................................................................14, 19

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,*
  403 U.S. 388 (1971) ...............................................................................................................11

*Booker v. S.C. Dep't of Corr.,*
  855 F.3d 533 (4th Cir. 2017) ...........................................................................................2, 17

*Boyd v. United States,*
  116 U.S. 616 (1886) .................................................................................................................6

*Carpenter v. United States,*
  138 S. Ct. 2206 (2018) ............................................................................................................5

*City of Indianapolis v. Edmond,*
  531 U.S. 32 (2000) .................................................................................................................14

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) .................................................................................................................11

*Dean v. McKinney,*
  976 F.3d 407 (4th Cir. 2020) ..............................................................................................18

*Doe v. Meron,*
  929 F.3d 153 (4th Cir. 2019) .......................................................................................2, 5, 8

*Doe v. United States,*
  381 F. Supp. 3d 573 (M.D.N.C. 2019) .............................................................................11

*English v. Dyke,*
  23 F.3d 1086 (6th Cir. 1994) ..............................................................................................16

*Entick v. Carrington,*
  19 Howell's State Trials 1029 (C.P. 1765) ........................................................................7

*Fields v. City of Philadelphia,*
  862 F.3d 353 (3d Cir. 2017).................................................................................................1

*Florida v. Wells,*
  495 U.S. 1 (1990)...................................................................................................................15

*Glik v. Cunniffe,*
  655 F.3d 78 (1st Cir. 2011).............................................................................................6, 18

*Hernández v. Mesa*,
    140 S. Ct. 735 (2020) ............................................................................2-3, 13-15

*Hope v. Pelzer*,
    536 U.S. 730 (2002) .......................................................................................17

*Index Newspapers LLC v. U.S. Marshals Serv.*,
    977 F.3d 817 (9th Cir. 2020) ............................................................................1

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee*,
    505 U.S. 672 (1992) .......................................................................................19

*Korb v. Lehman*,
    919 F.2d 243 (4th Cir. 1990) ........................................................................4, 6

*Lee v. Gregory*,
    363 F.3d 931 (9th Cir. 2004) .........................................................................18

*Linlor v. Polson*,
    263 F. Supp. 3d 613 (E.D. Va. 2017) ....................................................4, 8, 10-13

*Linlor v. Polson*,
    No. 1:17-cv-0013, 2018 WL 10418979 (E.D. Va., Feb. 1, 2018) ..........................15

*Loumiet v. United States*,
    948 F.3d 376 (D.C. Cir. 2020) .........................................................................5

*Mack v. Yost*,
    968 F.3d 311 (3d Cir. 2020) .............................................................................5

*Mills v. Alabama*,
    384 U.S. 214 (1966) .........................................................................................6

*Mocek v. City of Albuquerque*,
    No. CIV 11-1009 JB/KBM, 2013 WL 312881 (D.N.M. Jan. 14, 2013) ................17

*Pearson v. Callahan*,
    555 U.S. 223 (2009) .........................................................................................2

*Riley v. California*,
    573 U.S. 373 (2014) .......................................................................................5-6

*Skinner v. Ry. Labor Executives' Ass'n*,
    489 U.S. 602 (1989) .......................................................................................15

*Smith v. City of Cumming*,
    212 F.3d 1332 (11th Cir. 2000) ........................................................................6

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011)................................................................................17

*Stanford v. Texas*,
    379 U.S. 476 (1965)...............................................................................6-7

*Szymecki v. City of Norfolk*,
    No. 2:08CV142, 2008 WL 11441862 (E.D. Va. Oct. 21, 2008) ...............18

*Szymecki v. Houck*,
    353 F. App'x 852 (4th Cir. 2009) (per curiam) ......................................18

*Tanzin v. Tanvir*,
    No. 19-71, 2020 WL 7250100 (U.S. Dec. 10, 2020)...............................7-8

*Taylor v. Riojas*,
    No. 19-1261, 2020 WL 6385693 (U.S. Nov. 2, 2020) (per curiam)..............17-18

*Tobey v. Jones*,
    706 F.3d 379 (4th Cir. 2013) ...........................................................3, 17, 19

*Trulock v. Freeh*,
    275 F.3d 391 (4th Cir. 2001) ..................................................................4

*United States v. Aigbekaen*,
    943 F.3d 713 (4th Cir. 2019) ................................................................5-6

*United States v. Jones*,
    565 U.S. 400 (2012)..................................................................................5

*Vanderklok v. United States*,
    868 F.3d 189 (3d Cir. 2017)................................................................4, 8-9

*Wilkie v. Robbins*,
    551 U.S. 537 (2007)...............................................................................10

*Wood v. Moss*,
    572 U.S. 744 (2014)..................................................................................4

*Ziglar v. Abbasi*,
    137 S. Ct. 1843 (2017)..............................................................2-3, 8, 10, 12-13

**Statutes**

49 U.S.C. § 114..............................................................................................14

49 U.S.C. § 44926(a) ...................................................................................8-9

iv

## Other Authorities

DHS, *DHS TRIP Application Process FAQ*,
    https://trip.dhs.gov/TRIP/Home/FAQPage .......................................................... 9-10

DHS, *Redress Control Numbers*, https://www.dhs.gov/redress-control-numbers ................. 10-11

DHS, *Submitting the DHS TRIP Application*, https://trip.dhs.gov/ ................................. 9

DHS, *TRIP Application*, https://trip.dhs.gov/TRIP/Form/TripForm ............................... 9

Doori Song, Note, *Qualified Immunity and the Clear, but Unclear First
    Amendment Right to Film Police*,
    33 Notre Dame J.L. Ethics & Pub. Pol'y 337 (2019) ............................................. 18

James E. Pfander, Alexander A. Reinert, & Joanna C. Schwartz, *The Myth of
    Personal Liability: Who Pays When Bivens Claims Succeed*,
    72 Stan. L. Rev. 561 (2020) .......................................................................... 14

Press Release, TSA, *TSA Reminds Travelers of Security Procedures for the
    Carnival Travel Season* (May 2, 2019),
    https://www.tsa.gov/news/press/releases/2019/05/02/tsa-reminds-travelers-
    security-procedures-carnival-travel-season ...................................................... 10

Restatement (Second) of Torts § 217 ...................................................................... 5

Statement of Interest of the United States, *Sharp v. Baltimore City Police Dep't*,
    No. 1:11-cv-02888-BEL, 2012 WL 9512053 (D. Md. Jan. 10, 2012) ..................... 18-19

Thomas M. Cooley, *A Treatise on the Constitutional Limitations* (1868) .................... 19

TSA, *Can I Film and Take Photos at a Security Checkpoint?*,
    https://www.tsa.gov/travel/frequently-asked-questions/can-i-film-and-take-
    photos-security-checkpoint ......................................................................... 13

TSA, *Complaint*, https://www.tsa.gov/contact-center/form/complaints ........................ 10

William J. Stuntz, *The Substantive Origins of Criminal Procedure*,
    105 Yale L.J. 393 (1995) .............................................................................. 6

## INTEREST OF AMICI

Pursuant to the Court's Order of October 19, 2020 (ECF No. 26), Professors Crocker and Hasbrouck file this brief.  They are scholars of civil rights with an interest in the sound development of the *Bivens* doctrine and qualified immunity.  Professor Crocker is an Assistant Professor of Law at William & Mary Law School.  Professor Hasbrouck is an Assistant Professor of Law at Washington and Lee School of Law.  They express solely their own views and not any views of their institutions.[1]

## INTRODUCTION

This case illustrates how the First Amendment functions as an essential backstop to Fourth Amendment freedoms—and vice versa.  As revealed by the national response to the killing of George Floyd and so many similar injustices, the ability to record encounters with government representatives is critical to preserving civil rights, and especially the right to avoid excessive force.  The public only "became aware of the circumstances surrounding George Floyd's death because citizens standing on a sidewalk exercised their First Amendment rights and filmed a police officer kneeling on Floyd's neck until he died."  *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 831 (9th Cir. 2020).  Indeed, "the proliferation of bystander videos has spurred action at all levels of government to address police misconduct and to protect civil rights."  *Fields v. City of Philadelphia*, 862 F.3d 353, 360 (3d Cir. 2017) (internal quotation omitted).  In assessing this case, the Court should keep in mind the powerful role that video recording can play in protecting the public—especially communities of color—from abusive government conduct.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), Amici declare that no party's counsel authored the brief in whole or in part; that no party or party's counsel contributed money intended to fund preparing or submitting the brief; and that no person, other than Amici, their members or their counsel, contributed money intended to fund preparing or submitting the brief.

**ARGUMENT**

In *Ziglar v. Abbasi*, the Supreme Court outlined a two-step framework for analyzing the availability of *Bivens* remedies.  137 S. Ct. 1843, 1857–58 (2017).  The Court applied the same approach in its most recent *Bivens* case, *Hernández v. Mesa*, 140 S. Ct. 735, 743 (2020).  Under this framework, "[a] court must first consider whether a case presents a new *Bivens* context."  *Doe v. Meron*, 929 F.3d 153, 167–68 (4th Cir. 2019).  If so, it "must then conduct a special factors analysis to determine whether an action should proceed."  *Id.* at 168.  This analysis asks "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed."  *Id.* (quoting *Abbasi*, 137 S. Ct. at 1858).  If a factor "cause[s] a court to hesitate before answering . . . in the affirmative," *id.* (quoting *Abbasi*, 137 S. Ct. 1858), it should "reject the request" to recognize a *Bivens* claim, *Hernández*, 140 S. Ct. at 743.

For qualified immunity, the doctrine asks "whether a constitutional violation occurred and whether the right violated was clearly established at the time of the official's conduct."  *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017) (internal quotation omitted).  The Supreme Court has encouraged tribunals to address both questions in some situations.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  But courts may "take these steps in either order," such that answering the clearly-established question in the negative can render answering the constitutional-violation question unnecessary.  *Booker*, 855 F.3d at 538.

**I.    There are good reasons to recognize a *Bivens* action against TSA agents who violate airline passengers' Fourth and First Amendment rights.**

*Abbasi* and *Hernández* confirm that the Supreme Court approaches extending *Bivens* to new contexts with extreme skepticism.  *See Hernández*, 140 S. Ct. at 742–43 ("We have stated that expansion of *Bivens* is 'a disfavored judicial activity' and have gone so far as to observe that

2

if 'the Court's three *Bivens* cases [had] been . . . decided today,' it is doubtful that we would have reached the same result." (alterations in original) (quoting *Abbasi*, 137 S. Ct. at 1856–57)).  But *Abbasi* and *Hernández* do not prohibit courts from recognizing additional *Bivens* claims.  Instead, in the face of separate opinions directly or indirectly urging the *Bivens* regime's repudiation, *see Hernández*, 140 S. Ct. at 750–53 (Thomas, J., concurring); *Abbasi*, 137 S. Ct. at 1869–70 (Thomas, J., concurring in part and concurring in the judgment), the Supreme Court again chose to preserve a (narrow) path to expansion.

With this backdrop in mind, recognizing both Fourth and First Amendment *Bivens* claims in the present case would be legally and logically justified.

### A.  Fourth and First Amendment *Bivens* actions against TSA agents are consistent with prior cases from the Fourth Circuit and the Eastern District.

The Fourth Circuit has assumed the viability of *Bivens* claims against TSA agents.  In *Tobey v. Jones*, an airline passenger sued TSA agents, alleging that they violated his Fourth and First Amendment rights when they called airport police, leading to his arrest, after he removed his shirt in a screening line to reveal the Fourth Amendment's text on his chest.  706 F.3d 379, 383–84 (4th Cir. 2013).  Reviewing a decision by Judge Hudson, the Fourth Circuit reversed the dismissal of the First Amendment claim, declaring it "crystal clear that the First Amendment protects peaceful nondisruptive speech in an airport" and concluding that the plaintiff "adequately pled that [the TSA agents] violated his clearly established First Amendment rights."  *Id.* at 391, 394.

*Tobey* did not expressly address the existence of a *Bivens* remedy, and the Fourth Amendment claim was not technically at issue because it had been dismissed on grounds not allowing an interlocutory appeal.  But the fact that the majority framed the issue as "whether [the plaintiff] alleged plausible *Bivens* claims against [the TSA agents]," *id.* at 386, and that the dissent

3

specifically noted a question about "[w]hether the cause of action asserted by [the plaintiff] would lie under *Bivens*," *id.* at 405 n.* (Wilkinson, J., dissenting), indicates that the Fourth Circuit assumed the viability of the First Amendment *Bivens* theory.  There can be little doubt that the court did the same for the Fourth Amendment claim.  *See id.* at 389 (majority opinion) (stating that "the district court's Fourth Amendment holding is undermined by its erroneous conclusion that [the TSA agents] cannot be found liable for [the plaintiff's] arrest").

The Eastern District has gone even further in the TSA-defendant context than *Tobey* did. In *Linlor v. Polson*, Judge Cacheris recognized a Fourth Amendment *Bivens* claim where the plaintiff sued a TSA agent for excessive force on allegations that the agent intentionally or recklessly "struck him in the groin" during a screening-line pat-down.  263 F. Supp. 3d 613, 617–18 (E.D. Va. 2017).  *Linlor* found *Tobey*'s "suggest[ion] that the airport setting does not, in and of itself, insulate federal officers from constitutional claims" especially "salient[]."  *Id.* at 620.

In the First Amendment context, the Supreme Court has repeatedly assumed the existence of *Bivens* claims, including as recently as 2014.  *See Wood v. Moss*, 572 U.S. 744, 757 (2014). And *Tobey* is consistent with decades of Fourth Circuit rulings.  *See Korb v. Lehman*, 919 F.2d 243, 248 (4th Cir. 1990) (stating that "[w]e believe a *Bivens* action should . . . exist" in a First Amendment retaliation context but affirming dismissal on qualified-immunity grounds); *see also Trulock v. Freeh*, 275 F.3d 391, 397 (4th Cir. 2001) (concluding that "the complaint sufficiently pleads a claim under the First Amendment" without addressing the *Bivens* question).

Some courts since *Abbasi* have declined to recognize First Amendment *Bivens* actions when implementing the Supreme Court's restrictive approach.  Although *Vanderklok v. United States*, 868 F.3d 189 (3d Cir. 2017), provides an exception, these cases are generally distinguishable because they rely on circumstances not present here.  Some point to factors

particular to the prison and retaliation-claim contexts. *See, e.g.*, *Mack v. Yost*, 968 F.3d 311, 322–25 (3d Cir. 2020). Some place weight on alternative remedial schemes. *See, e.g.*, *Mack*, 968 F.3d at 320–21; *Loumiet v. United States*, 948 F.3d 376, 384–85 (D.C. Cir. 2020). And the Fourth Circuit rested its decision in *Doe* on "the existence of an alternative remedial scheme . . . under the Military Claims Act" and on the fact that the plaintiff's "claims arose in a military context" and "would extend *Bivens* extraterritorially." 929 F.3d at 169–70.

Even acknowledging the Supreme Court's increasing hostility to *Bivens* actions, case law provides support for recognizing Fourth and First Amendment *Bivens* claims here.

**B.     Fourth and First Amendment *Bivens* actions against TSA agents are consistent with the Bill of Rights' core concerns and history.**

Considered in light of the Bill of Rights' purposes and foundations, the critical role that cell-phone videos play in public discourse supports addressing their improper search and seizure through *Bivens* actions.

The Fourth Amendment protects against both violating a person's reasonable expectations of privacy and trespassing against a person's property. *United States v. Jones*, 565 U.S. 400, 409 (2012). Federal courts have repeatedly recognized that cell phones trigger Fourth Amendment safeguards. *See, e.g.*, *Carpenter v. United States*, 138 S. Ct. 2206, 2223 (2018) (referring to the collection of cell-phone location data as a tool that "risks Government encroachment of the sort the Framers . . . drafted the Fourth Amendment to prevent"). Dyer's allegations implicate both the Fourth Amendment's traditional property concerns, *see* Restatement (Second) of Torts § 217 ("A trespass to a chattel may be committed by intentionally . . . using or intermeddling with a chattel in possession of another."), and its modern privacy concerns, *see Riley v. California*, 573 U.S. 373, 403 (2014) (requiring warrants to search cell phones because they frequently contain "the privacies of life" (internal quotation omitted)); *United States v. Aigbekaen*, 943 F.3d 713, 722 (4th Cir. 2019)

(stating that cell phones "feature 'an element of pervasiveness'" that "'implicate[s] privacy concerns far beyond those implicated' by physical searches" (quoting *Riley*, 573 U.S. at 393, 395)).

"The protection of citizens' right to speak publicly on matters of public concern . . . is at the very heart of the First Amendment." *Korb*, 919 F.2d at 247. Dyer's allegations implicate this core concern as well. For the First Amendment secures "the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest." *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *see also Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011) ("Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting 'the free discussion of governmental affairs.'" (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)).

The historical underpinnings of the Fourth and First Amendments demonstrate why Dyer's allegations strike at the heart of these constitutional protections. The English cases of John Entick and John Wilkes were central to the Fourth Amendment's development. *See Stanford v. Texas*, 379 U.S. 476, 481–85 (1965); *Boyd v. United States*, 116 U.S. 616, 624–30 (1886). Entick and Wilkes were "both authors of political pamphlets critical of the King's ministers," and "[a]s a consequence, both suffered the ransacking of their homes and the seizure of all their books and papers." William J. Stuntz, *The Substantive Origins of Criminal Procedure*, 105 Yale L.J. 393, 397 (1995). They "both sued the officials who ordered or carried out the searches," and "both won (and collected substantial damages)." *Id.* "[I]n both cases Chief Justice Pratt (later Lord Camden) offered ringing declarations about the importance of limiting executive power to search for and seize private papers in private homes." *Id.* But he also declared that a trespass against papers offended personal freedom more than a trespass against a home alone—and thus justified greater

damages. *Entick v. Carrington*, 19 Howell's State Trials 1029, 1066 (C.P. 1765) ("Papers are the owner's . . . dearest property; and are so far from enduring a seizure, that they will hardly bear an inspection; and . . . where private papers are removed and carried away, the secret nature of those goods will be an aggravation of the trespass, and demand more considerable damages in that respect.").

The Constitution's framers understood the connection between the powers of search and seizure and the danger of suppressing dissent. "The Bill of Rights was fashioned against the background of knowledge that unrestricted power of search and seizure could be an instrument for stifling liberty of expression." *Stanford*, 379 U.S. at 484 (internal quotation omitted). The Supreme Court has explained that not only "the prohibitions of the Fourth [Amendment]," but also "[t]he commands of our First Amendment" and the dictates of the Fifth Amendment "reflect the teachings of Entick v. Carrington." *Id.* at 484–85 (internal quotation omitted). For "[t]hese three amendments are indeed closely related, safeguarding not only privacy and protection against self-incrimination but conscience and human dignity and freedom of expression as well." *Id.* at 485 (internal quotation omitted).

The alleged search of Dyer's cell phone and seizure of a video of potential public import depicting government officials openly performing government functions echo the abuses that Entick and Wilkes suffered. The Fourth and First Amendments were designed to counteract precisely this kind of mischief, and damages supplied the traditional remedy. To the extent that any constitutional violations are compensable in damages today, the ones alleged here should be among them. *See Tanzin v. Tanvir*, No. 19-71, 2020 WL 7250100, at *5 (U.S. Dec. 10, 2020) ("The Government also posits that we should be wary of damages against government officials because these awards could raise separation-of-powers concerns. But this exact remedy has

coexisted with our constitutional system since the dawn of the Republic.").

> **C.** **Both claims present new *Bivens* contexts, but Defendants fail to invoke any special factors requiring the Court to decline to recognize damages remedies.**

Because the Supreme Court has never recognized a *Bivens* claim against TSA agents or for a First Amendment violation, Dyer's claims present new contexts.  *See Doe*, 929 F.3d at 169 (First Amendment claim); *Linlor*, 263 F. Supp. 3d at 620 (Fourth Amendment claim against a TSA agent).  His suit's viability thus turns on a special-factors analysis.

> **1.** **Defendants cite no alternative remedial structure.**

The presence of "an alternative remedial structure" constitutes an especially important part of the special-factors inquiry.  *Abbasi*, 137 S. Ct. at 1858 (stating that this "alone may limit the power of the Judiciary to infer a new *Bivens* cause of action").  The only framework Defendants cite is the Travelers Redress Inquiry Program (TRIP) within the Department of Homeland Security (DHS).  But TRIP appears to provide no relief to a party in Dyer's circumstances.

As an initial matter, Defendants' reliance on *Vanderklok* is misplaced.  In *Vanderklok*, the Third Circuit "assume[d] for the sake of discussion that [the TRIP process] was *not* a meaningful remedy . . . because [it] appears to be used primarily as a means to challenge inclusion on terrorism watch lists."  868 F.3d at 205 (emphasis added).  But given the facts,[2] the Third Circuit also acknowledged that the plaintiff may have been able to utilize the program because he "was 'delayed or prohibited from boarding a commercial aircraft because [he was] wrongly identified

---

[2] In *Vanderklok*, the TSA subjected the plaintiff to secondary screening because "[i]n his carry-on luggage, he had a heart monitor and watch stored inside a piece of PVC pipe that was capped on both ends."  868 F.3d at 193.  The plaintiff alleged that the TSA agent supervising the screening "was disrespectful and aggressive," causing the plaintiff to "state[] an intent to file a complaint."  *Id.*  The plaintiff alleged that the TSA agent then falsely reported that the plaintiff had issued a bomb threat, which led to the plaintiff's arrest.  *Id.*

as a threat'" within the terms of statutory law, *id.* (alteration in original) (quoting 49 U.S.C. § 44926(a)), and believed he was "unfairly detained" within the terms of the TRIP website, *id.* The present case does not involve allegations related to a terrorism watch list.  It does not involve allegations that Dyer was delayed or denied boarding because he was deemed a threat.  Nor does it involve allegations that Dyer was detained in the same sense.

This case does involve allegations that Dyer's "'civil rights [were] violated because [the] questioning or treatment during screening was abusive or coercive,'" which *Vanderklok* said the TRIP "online complaint form" allowed passengers to report.  *Id.*  Nowadays, however, language similar to the text the Third Circuit quoted directs users to a *different* DHS procedure, which Defendants do not cite here.  *See* DHS, *Submitting the DHS TRIP Application*, https://trip.dhs.gov/ (stating that "[i]f the traveler wishes to make a civil rights and civil liberties complaint, he/she may use the following link to learn more about the DHS Office for Civil Rights and Civil Liberties (CRCL) or use the CRCL Complaint Tool to file a complaint" and mentioning that the CRCL investigates allegations of "abusive or coercive questioning").[3]  All this renders *Vanderklok*'s alternative-remedial-structure reasoning inapposite.

Indeed, there are additional reasons to conclude that TRIP would almost certainly not provide Dyer any redress for his constitutional claims.  The TRIP website specifies that the program "is not designed to address travel issue [sic] related to . . . [d]elayed [sic] during travel

---

[3] The TRIP website further provides that "[i]f your concern relates solely to a belief . . . that your civil rights have been violated, you may skip to Section 'Incidents Related to Privacy' of [the TRIP] form."  DHS, *Submitting the DHS TRIP Application*, https://trip.dhs.gov/.  That section provides only the ability to check a box stating "I believe my privacy has been violated because a government agent has exposed or inappropriately shared my personal information" and to "describe incident [sic] related to the box(es) you have checked."  DHS, *TRIP Application*, https://trip.dhs.gov/TRIP/Form/TripForm.

9

due to a disability or medical condition," DHS, *DHS TRIP Application Process FAQ*, https://trip.dhs.gov/TRIP/Home/FAQPage.  Dyer's allegations are at least arguably connected to a medical condition given that the TSA itself has called infant formula a "medically necessary liquid[]."  Press Release, TSA, *TSA Reminds Travelers of Security Procedures for the Carnival Travel Season* (May 2, 2019), https://www.tsa.gov/news/press/releases/2019/05/02/tsa-reminds-travelers-security-procedures-carnival-travel-season.

The TRIP website, under the heading "When does DHS TRIP Not Apply?," further states that "[i]f you have questions or concerns regarding your experience at the [TSA] security screening checkpoint, please contact the TSA Contact Center."  DHS, *DHS TRIP Application Process FAQ*, https://trip.dhs.gov/TRIP/Home/FAQPage.  This implies that screening-specific complaints do not fall within TRIP's purview.[4]

Finally, the same website section states that "[r]equests for claims or compensation" are inappropriate.  *Id.*  Supreme Court precedent makes clear that an alternative remedial structure need not provide damages to be relevant for *Bivens* purposes.  *See Abbasi*, 137 S. Ct. at 1862–63.  But the *only* remedy TRIP appears to provide is that "[a]ll relevant US Government records will be updated or corrected as appropriate," DHS, *DHS TRIP Application Process FAQ*, https://trip.dhs.gov/TRIP/Home/FAQPage, with passengers receiving a "Redress Control Number" to "streamline[] the watch list matching process" for the future, DHS, *Redress Control*

---

[4] Defendants say nothing about the TSA Contact Center, which (among other resources) provides an online "Complaint" form with a category for "Civil Rights and Liberties."  TSA, *Complaint*, https://www.tsa.gov/contact-center/form/complaints.  *Linlor*, however, said the Contact Center appears to "afford[] individuals only the bare opportunity to make the TSA aware of a complaint," which "is not the sort of alternative process that provides a 'convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.'"  263 F. Supp. 3d at 621–22 (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)).

*Numbers*, https://www.dhs.gov/redress-control-numbers.  That relief does not respond in any way to Dyer's claims.

As in *Bivens* itself, it appears that "[f]or people in [Dyer's] shoes, it is damages or nothing." *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 410 (1971) (Harlan, J., concurring in the judgment).[5]

> **2.     The context of this case does not raise national-security concerns different from contexts in which *Bivens* claims are already allowed.**

Defendants point to national-security concerns surrounding airports as a special factor, arguing that subjecting TSA agents to *Bivens* actions would run a serious risk of making them timid in performing their important job duties.  It would be difficult to respond in a more complete and compelling way than Judge Cacheris did in *Linlor*:

> While the Court agrees that appreciable national security concerns would, if raised, preclude a *Bivens* remedy here, Defendant does not adequately explain how this case presents such concerns. . . . The relevant context here is a TSA officer's alleged use of excessive force [under the Fourth Amendment] during an airport security screening. . . . Defendant's [motion to dismiss] does little to tie specific national security concerns to the context under consideration.  Rather, it rests primarily upon generalizations about the *sui generis* nature of the airport setting. Defendant is correct that Courts have consistently recognized airports as loci of special security concerns. . . . But that does not mean generic national security concerns bar any constitutional claim arising at an airport.

263 F. Supp. 3d at 622–23 (paragraph breaks omitted).  For this proposition, Judge Cacheris cited *Tobey* and quoted *Abbasi*'s admonition that "national-security concerns must not become a

---

[5] Defendants suggest that no relief exists here under the Federal Tort Claims Act and do not mention equitable or declaratory relief.  In any event, it is doubtful that these sources could supply an alternative remedy for Dyer's alleged injuries.  There is a split among district courts in the Fourth Circuit over the relevance of the FTCA to the *Bivens* inquiry since *Abbasi*.  *Doe v. United States*, 381 F. Supp. 3d 573, 614–15 (M.D.N.C. 2019) (collecting cases).  And Dyer likely has no standing to seek equitable or declaratory relief.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 104 (1983) (holding that to seek such remedies, plaintiffs must establish "a real and immediate threat of repeated injury" (internal quotation omitted)).

talisman used to ward off inconvenient claims." *Id.* at 623 (quoting 137 S. Ct. at 1862).

"The question," Judge Cacheris continued, "is not whether airports present special security concerns—they do—but whether those concerns have any particular bearing on the context at issue in this case." *Id.* The answer, he concluded, was no:

> The only specific concern Defendant identifies is the risk that implying a *Bivens* remedy here might chill legitimate TSA activity and discourage TSA officers from performing appropriately thorough security screenings. The risk of deterring legitimate law enforcement activity through personal liability, however, is not unique to this context. Indeed, it is a risk that inheres whenever courts imply a *Bivens* remedy. Federal officers have, for nearly fifty years, navigated such concerns while performing Fourth Amendment searches. Many of Defendant's observations about the nature of the TSA's work—for example, that TSA officers must make split second decisions in a fast moving environment to protect public safety—are no less applicable to the work of other federal agents who have successfully contended with *Bivens* liability.

*Id.* Judge Cacheris also reasoned that the conduct in question "is not conduct that the TSA has deemed necessary, or even desirable, to protect national security," but was instead behavior in which "the TSA expressly forbids its officers to engage." *Id.* at 624.

In short, Judge Cacheris explained, "Defendant provides no reason to believe that TSA officers will be uniquely deterred from the adequate performance of their duties if faced with *Bivens* liability." *Id.* Refusing to recognize a cause of action on this ground, he said, "would essentially overrule *Bivens*." *Id.* And in any event, he said, "it is the purpose of qualified immunity to provide TSA officers with the breathing room they require to operate effectively." *Id.*

All this logic applies here. Defendants' briefing "does little to tie specific national security concerns to the context under consideration." *Id.* at 623. Rather, "[t]he only specific concern Defendant[s] identif[y] is the risk that implying a *Bivens* remedy here might chill legitimate TSA activity and discourage TSA officers from performing appropriately thorough security screenings." *Id.* The conduct Dyer alleges "is not conduct that the TSA has deemed necessary, or even desirable, to protect national security," but is instead behavior in which "the TSA expressly

forbids its officers to engage." *Id.* at 624.[6]

There thus exists little reason for the Court to handle the invocation of national-security concerns here any differently than *Linlor* did. To be sure, the Supreme Court in *Hernández*—which postdates *Linlor* and involved the cross-border shooting of a Mexican teenager by a U.S. Customs and Border Patrol agent—took a very deferential approach to national-security issues. *See* 140 S. Ct. at 745–47. *Hernández* suggests that courts should be alert to the possibility of *Bivens*-preclusive national-security implications any time a suit arises in a sensitive location. *See id.* at 746. But in *Hernández*, the Supreme Court specified that the U.S. Department of Justice (DOJ) "concluded that [the defendant] had not violated Customs and Border Patrol policy or training." *Id.* at 740. Emphasizing that "'[n]ational-security policy is the prerogative of the Congress and President,'" the Court expressed concern about "regulating the conduct of agents at the border" by "extending *Bivens* into this field." *Id.* at 746–47 (quoting *Abbasi*, 137 S. Ct. at 1861). *Hernández* is thus distinguishable here for the same reason that *Linlor* held previous cases rejecting *Bivens* relief on national-security grounds inapposite: "[t]here is no comparable risk of entangling the judiciary in sensitive matters of national security through second-guessing executive policy," for "if anything, this action harmonizes with the TSA's avowed policy." *Linlor*, 263 F. Supp. 3d at 625.[7]

---

[6] *See* TSA, *Can I Film and Take Photos at a Security Checkpoint?*, https://www.tsa.gov/travel/frequently-asked-questions/can-i-film-and-take-photos-security-checkpoint ("TSA does not prohibit photographing, videotaping or filming at security checkpoints, as long as the screening process is not interfered with or sensitive information is not revealed. Interference with screening includes but is not limited to holding a recording device up to the face of a TSA officer so that the officer is unable to see or move, refusing to assume the proper stance during screening, blocking the movement of others through the checkpoint or refusing to submit a recording device for screening. Additionally, you may not film or take pictures of equipment monitors that are shielded from public view.").

[7] The Supreme Court in *Hernández* also differentiated between Border Patrol agents who

Moreover, just as considerations about incentivizing appropriate behavior are already baked into the qualified-immunity inquiry, considerations about the general national-security issues involved in air travel are already baked into the constitutional-merits inquiries. *See, e.g.*, *City of Indianapolis v. Edmond*, 531 U.S. 32, 47–48 (2000) (stating that the rule requiring individualized suspicion under the Fourth Amendment for general crime-control checkpoint stops "does not affect the validity of border searches or searches at places like airports and government buildings, where the need for such measures to ensure public safety can be particularly acute"); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012) (in disapproving on First Amendment grounds a statute prohibiting the open recording of government officials performing their jobs in public, stating that "[n]othing we have said here immunizes behavior that obstructs or interferes with effective law enforcement or the protection of public safety"). It makes little sense to double or even triple count these considerations by denying *Bivens* actions on their account.[8]

National-security concerns need not defeat Dyer's assertion of *Bivens* claims against TSA

---

"work miles from the border" and those who "are stationed right at the border and have the responsibility of attempting to prevent illegal entry," stating that "the conduct of [the latter] has a clear and strong connection to national security." 140 S. Ct. at 746. While the work of TSA officials within an airport setting does not present the same degree of geographic separation, the conduct of agents performing first-order screenings may involve less of "a clear and strong connection to national security" than does the conduct of other TSA officials—like specially designated law-enforcement officers, *see* 49 U.S.C. § 114, or federal air marshals. Any determination regarding the functions of specific TSA officials would be more appropriate at the summary-judgment stage than on the basis of the current briefing.

[8] It is worth mentioning that any assumption that public officials generally bear financial responsibility for *Bivens* actions misses how the federal government appears to handle such suits. *See* James E. Pfander, Alexander A. Reinert, & Joanna C. Schwartz, *The Myth of Personal Liability: Who Pays When Bivens Claims Succeed*, 72 Stan. L. Rev. 561, 566 (2020) ("find[ing] that the federal government effectively held its officers harmless in over 95% of the successful cases brought against them, and paid well over 99% of the compensation received by plaintiffs" in the data set).

agents for their conduct in an airport screening line.

> **3.      None of the other concerns Defendants cite qualify as special factors.**

Defendants assert that the lack of a damages remedy in statutory law is a special factor. But Defendants would have presumably argued that any express damages relief displaced *Bivens* as an alternative remedial structure.  In any event, Defendants do not point to an accumulation of negative implications from statutory law like the kind the Supreme Court found significant in *Hernández*.  *See* 140 S. Ct. at 749 (stating that a "pattern of congressional action"—specifically, "refraining from authorizing damages actions for injury inflicted abroad by Government officers, while providing alternative avenues for compensation in some situations" —provided "reason to hesitate about extending *Bivens*" to extraterritorial injuries).

Defendants also raise the potential need for additional training if TSA agents are subjected to *Bivens* suits.  But the training required to satisfy Fourth Amendment standards should be minimal.  The safety of the traveling public presents "special needs" justifying "departures from the usual warrant and probable-cause requirements."  *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 620 (1989).  So where officials conduct these kinds of searches, the Supreme Court has said they must follow standardized procedures.  *See Florida v. Wells*, 495 U.S. 1, 4 (1990) (requiring standardized criteria or an established routine to govern the opening of containers during inventory searches to avoid their repurposing for general investigative aims).  These procedures may provide something of a safe harbor.  Indeed, the fact that the evidence showed the defendant had adhered to established procedures ultimately doomed the excessive-force claim in *Linlor*.  *See Linlor v. Polson*, No. 1:17-cv-0013, 2018 WL 10418979, at *4–5 (E.D. Va. Feb. 1, 2018) (concluding that because the pat-down occurred in compliance with TSA procedures, the search was reasonable and the defendant was entitled to qualified immunity).  The lesson a TSA agent would need to learn to avoid inflicting the kind of harm Dyer alleges is even simpler: follow the

agency's policy allowing recording that does not interfere with the screening process or reveal sensitive information.

Even in light of recent Supreme Court precedent, this matter presents a strong case for recognizing Fourth and First Amendment *Bivens* claims against TSA agents for conduct occurring in airport screening lines. At the very least, the Court could recognize the Fourth Amendment claim alone, given its closer connection to *Bivens* itself. Or the Court could recognize the First Amendment claim because of its integral connection to the Fourth Amendment claim, leaving broader questions about First Amendment claims for another day. Finally, if the Court declines to expand *Bivens* to a new constitutional right, it should confine its reasoning to the airport setting, preserving the possibility that plaintiffs in different circumstances could pursue First Amendment claims against federal officials in the future.

## II.     There are good reasons to reject Defendants' assertion of qualified immunity.

Defendants' assertion of qualified immunity is fragmentary and flawed.

### A.     Defendants have waived this defense for the Fourth Amendment claim.

Defendants do not assert qualified immunity from Dyer's Fourth Amendment claim and have therefore waived the defense for now. *See English v. Dyke*, 23 F.3d 1086, 1090 (6th Cir. 1994) ("[A] defendant who fails to timely assert the defense [of qualified immunity] prior to discovery may waive the right to avoid discovery but may nonetheless raise the issue after discovery on summary judgment or at trial.").

### B.     The First Amendment right appears to be clearly established.

Defendants do assert qualified immunity from Dyer's First Amendment claim—to some extent. They relegate the first step of the analysis (regarding whether a constitutional violation occurred) to a footnote saying there is "good reason" to treat recording TSA agents and recording police officers differently without saying what that "good reason" might be. The logic of the single

16

decision they cite is quite strained.  *See Mocek v. City of Albuquerque*, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *54 (D.N.M. Jan. 14, 2013) (saying, among other things, that the plaintiff's filming "diverted the attention of TSA employees, who could have assisted other passengers who had forgotten their identification and needed to proceed through the alternative screening procedures so as to be able to board their flights" and "could thus have resulted in delays to other passengers, causing them to incur increased costs").

Defendants rest almost the entirety of their argument on the second step of the analysis (regarding whether the right at issue was clearly established).  Contrary to their contention, the status of the right in other jurisdictions matters.  In *Booker*, the Fourth Circuit explained that "[i]n the absence of controlling authority that specifically adjudicates the right in question, a right may still be clearly established in one of two ways."  855 F.3d at 543.  First, "[a] right may be clearly established if 'a general constitutional rule already identified in the decisional law . . . appl[ies] with obvious clarity to the specific conduct in question.'"  *Id.* (alterations in original) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  Second, "[a] right may also be clearly established based on a consensus of cases of persuasive authority from other jurisdictions."  *Id.* (internal quotation omitted).

Both pathways likely lead to clearly established law here.  The general constitutional rule identified in *Tobey*—that "the First Amendment protects peaceful nondisruptive speech in an airport, and that such speech cannot be suppressed solely because the government disagrees with it," 706 F.3d at 391—applies with obvious clarity to Dyer's allegations.  *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011) (confirming that the "right to speak is implicated when information [an individual] possesses is subjected to restraints on the way in which the information might be used or disseminated" (internal quotation omitted)); *see also Taylor v. Riojas*, No. 19-1261, 2020

17

WL 6385693, at *1 (U.S. Nov. 2, 2020) (per curiam) (reaffirming this method of defeating qualified immunity); *Dean v. McKinney*, 976 F.3d 407, 417–18 (4th Cir. 2020) (same).  Indeed, while identifying on-point circuit precedent to deny qualified immunity in a right-to-record case, the First Circuit also cited the idea that "some constitutional violations are 'self-evident' and do not require particularized case law to substantiate them."  *Glik*, 655 F.3d at 84–85 (quoting *Lee v. Gregory*, 363 F.3d 931, 936 (9th Cir. 2004)).

Moreover, a mass of persuasive authority holds that the First Amendment protects a right to record public officials.  According to a recent student note, "[w]ith the exception of the Tenth Circuit, courts in every circuit have held that there is a general First Amendment right to film police activities in public, subject to reasonable time, manner, and place restrictions."  Doori Song, Note, *Qualified Immunity and the Clear, but Unclear First Amendment Right to Film Police*, 33 Notre Dame J.L. Ethics & Pub. Pol'y 337, 342–44 (2019) (collecting cases).  In particular, the note tallies, "holdings of the courts of appeals in the First, Third, Fifth, Seventh, Ninth, and Eleventh Circuits, and . . . district court holdings in the Second, Fourth, Sixth, and Eighth Circuits" recognized the right as of 2019, the year the incident in this case allegedly occurred.  *Id.* at 344.[9] DOJ has even taken the same position.  *See* Statement of Interest of the United States, *Sharp v. Baltimore City Police Dep't*, No. 1:11-cv-02888-BEL, 2012 WL 9512053 (D. Md. Jan. 10, 2012)

---

[9] The Eastern District is one of the district courts within the Fourth Circuit that has extended the First Amendment to a right to record police conduct.  *See Szymecki v. City of Norfolk*, No. 2:08CV142, 2008 WL 11441862, at *4 (E.D. Va. Oct. 21, 2008).  After recognizing this right at the motion-to-dismiss stage, Judge Morgan granted the individual defendant qualified immunity at the summary-judgment stage, and the Fourth Circuit affirmed in a brief unpublished opinion stating that "the district court concluded that [the plaintiff's] asserted First Amendment right to record police activities on public property was not clearly established in this circuit at the time of the alleged conduct" and that "we agree."  *Szymecki v. Houck*, 353 F. App'x 852, 853 (4th Cir. 2009) (per curiam).  The Fourth Circuit's decision was not precedential, and the law in this area developed considerably over the subsequent decade.

("The right to record police officers while performing duties in a public place, as well as the right to be protected from the warrantless seizure and destruction of those recordings, are not only required by the Constitution.  They are consistent with our fundamental notions of liberty, promote the accountability of our governmental officers, and instill public confidence in the police officers who serve us daily.").

Defendants suggest that this case is distinguishable because it pertains to TSA agents in an airport.  But the reasoning underlying right-to-record decisions applies to TSA agents.  *See, e.g.*, *ACLU of Ill.*, 679 F.3d at 600 (stating that "a foremost purpose of the Constitution's guarantee of speech and press liberty is . . . '*to enable every citizen at any time to bring the government and any person in authority to the bar of public opinion by any just criticism upon their conduct in the exercise of the authority which the people have conferred upon them*'" (quoting Thomas M. Cooley, *A Treatise on the Constitutional Limitations* 421–22 (1868)).  And speech restrictions in airports, as in other non-public forums, must still satisfy a reasonableness standard, *Tobey*, 706 F.3d at 388 (citing *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 683 (1992))—something the conduct in question here, which contravenes TSA's own policy, cannot do.

For all these reasons, Defendants do not state a strong case for qualified immunity.

## CONCLUSION

There are good reasons to recognize Fourth and First Amendment *Bivens* actions against TSA agents and to reject Defendants' assertion of qualified immunity.  Nevertheless, acknowledging the trend in Supreme Court decisions away from a robust *Bivens* regime and believing that the Court could justify ruling either way on the relevant issues, Amici write in support of neither party.  Amici urge the Court to consider the importance of video recording to exposing and prompting the reform of unlawful government practices.

19

Dated: December 11, 2020            Respectfully submitted,

*/s/ Brian D. Schmalzbach*

Brian D. Schmalzbach (VA Bar # 88544)
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
Telephone: (804) 775-4746
Facsimile: (804) 698-2304
bschmalzbach@mcguirewoods.com

Katherine Mims Crocker (VA Bar # 87430)
WILLIAM & MARY LAW SCHOOL
P.O. Box 8795
Williamsburg, VA 23187-8795
Telephone: (757) 221-3758
kmcrocker@wm.edu

Anne L. Doherty (*pro hac vice*)
MCGUIREWOODS LLP
201 N. Tryon Street, Suite 3000
Charlotte, NC 28202
Telephone: (704) 373-4633
Facsimile: (704) 343-2300
adoherty@mcguirewoods.com

*Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

In accordance with this Court's Order of October 19, 2020 (ECF No. 26), this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,494 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

*/s/ Brian D. Schmalzbach*
Brian D. Schmalzbach (VA Bar # 88544)

*Attorney for Amici Curiae*

21

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2020, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system.  A copy has also been served via Federal Express on

the following:

Jonathan Corbett
958 N. Western Avenue #765
Hollywood, CA 90029

Dustin W. Dyer
9071 W. Broad Street
Henrico, VA 23294

John P. O'Herron
Thompson McMullan, P.C.
100 Shockoe Slip, 3rd Floor
Richmond, VA 23219

*/s/ Brian D. Schmalzbach*
Brian D. Schmalzbach (VA Bar # 88544)

*Attorney for Amici Curiae*